# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

JIMMY RAY BANEGAS,

      Plaintiff,

      vs.                                                                                            Civ. No. 16-500 KK

NANCY A. BERRYHILL,[1]
**Acting Commissioner of Social Security,**

      Defendant.

## MEMORANDUM OPINION AND ORDER[2]

**THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 17) filed November 10, 2016 in support of Plaintiff Jimmy Ray Banegas's ("Plaintiff") Complaint (Doc. 1) seeking review of the decision of Defendant Nancy A. Berryhill, Acting Commissioner of the Social Security Administration, ("Defendant" or "Commissioner") denying Plaintiff's claim for Title II disability insurance benefits. On January 13, 2017, Plaintiff filed his Motion to Reverse and Remand for Rehearing With Supporting Memorandum ("Motion"). (Doc. 20.) The Commissioner filed a Response in opposition on March 14, 2017 (Doc. 22), and Plaintiff filed a Reply on March 28, 2017. (Doc. 23.) The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c). Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds the Motion is well taken and is **GRANTED.**

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Nancy A. Berryhill is substituted for Carolyn Colvin as the Acting Commissioner of the Social Security Administration. Fed. R. Civ. P. 25(d).

[2] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case. (Docs. 4, 13, 14.)

## I. Background and Procedural Record

Claimant Jimmy Ray Banegas ("Mr. Banegas") alleges that he became disabled on November 5, 2010, at the age of fifty-six because of knee arthritis, shoulder arthroscopy, oculopharyngeal muscular dystrophy, arthritis, right shoulder injury, loss of strength in legs, weakness in arms, difficulty swallowing, and vision problems due to droopy eyelids. (Tr. 169-70, 206.[3]) Mr. Banegas has two years of college, and worked as an industrial security officer. (Tr. 207.)

On May 15, 2013, Mr. Banegas protectively filed an application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401 et seq. (Tr. 169-70.) Mr. Banegas's application was initially denied on August 6, 2013. (Tr. 92, 82-91, 105-08.) It was denied again at reconsideration on August 29, 2013. (Tr. 93-103, 104, 110-14.) On March 10, 2014, Mr. Banegas requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 115-16.) The ALJ conducted a hearing on December 11, 2015. (Tr. 55-81.) Mr. Banegas appeared in person at the hearing with attorney Gary Martone. (*Id.*) The ALJ took testimony from Mr. Banegas (Tr. 60-73), and an impartial vocational expert ("VE"), Shelley K. Eike. (Tr. 74-80.) On January 20, 2016, the ALJ issued an unfavorable decision. (Tr. 10-22.)

On April 8, 2016, the Appeals Council issued its decision denying Mr. Banegas's request for review and upholding the ALJ's final decision. (Tr. 1-6.) On May 31, 2016, Mr. Banegas timely filed a Complaint seeking judicial review of the Commissioner's final decision. (Doc. 1.)

---

[3] Citations to "Tr." are to the Transcript of the Administrative Record (Doc. 17) that was lodged with the Court on November 10, 2016.

## II. Standard of Review

We review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). A decision is based on substantial evidence where it is supported by "relevant evidence . . . a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). The Commissioner's decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

In considering an application for disability insurance benefits, the Commissioner uses a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). The claimant bears the burden of establishing a prima facie case of disability at steps one through four. 20 C.F.R. §§ 404.1520(a)(4)(i-iv); *Grogan v. Barnhart,* 399 F.3d 1257, 1261 (10th Cir. 2005). If the claimant successfully meets that burden, the burden of proof shifts to the Commissioner at step five to show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience. 404.1520(a)(v); *Grogan*, 399 F.3d at 1261.

## III. Analysis

The ALJ made his decision that Mr. Banegas was not disabled at step four of the sequential evaluation. He found that Mr. Banegas had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except as follows:

> he can lift and/or carry 20 pounds occasionally and 10 pounds frequently. He can stand and/or walk for six hours out of an eight-hour workday, with normal breaks. He can sit for six hours out of an eight-hour workday, with normal breaks. He is able to occasionally reach overhead with his dominant right upper extremity. He is unlimited with respect to pushing and/or pulling, other than as indicated for lifting and/or carrying. He can occasionally climb ramps and stairs, but never ladders, ropes and scaffolds. He is able to occasionally balance, stoop, crouch, kneel and crawl. He must avoid more than occasional exposure to unprotected heights, moving machinery and pulmonary irritants, such as dust, fumes, odors and gases.

(Tr. 17.) Based on the RFC and the testimony of the VE, the ALJ concluded that Mr. Banegas was capable of performing his past relevant work as a gate guard and security guard and that he was therefore not disabled. (Tr. 22.)

Mr. Banegas asserts three arguments in support of his Motion as follows: (1) the ALJ erred by failing to consider his oculopharyngeal muscular dystrophy ("OMD") and related symptoms in determining the RFC; (2) the ALJ erred by failing to make a function-by-function assessment; and (3) the ALJ erred at step four in finding that Mr. Banegas could return to his past relevant work. The Court agrees that the ALJ failed to properly consider Mr. Banegas's non-severe impairment of OMD and related symptoms in determining his RFC, and the decision of the Commissioner is therefore reversed.

### A. RFC

The ALJ determined at step two that Mr. Banegas had severe impairments of right shoulder rotator cuff tear, subacromial impingement and intra-articular tear of biceps tendon status port surgical repair; degenerative arthritis of the right knee; and coronary artery disease

4

status post stenting. (Tr. 16.) The ALJ also determined that Mr. Banegas suffered from non-severe impairments of left inguinal hernia status post surgical repair, OMD, hypertension, hyperlipidemia, visual disturbances (fallen eyelids) and obstructive sleep apnea (OSA). (*Id.*) In discussing Mr. Banegas's OMD, the ALJ explained that

> . . . The claimant's diagnosis of OMD causes him drooping eyelids, while the evidence of record also indicates that he has some mild weakness in his upper and lower extremities (Ex. 4F). I note, however, that the medical evidence of record lacks information on the claimant obtaining treatment for OMD symptoms, while he testified that he has not received any such treatment. . . .

(Tr. 16.) The ALJ concluded that, other than Mr. Banegas's obstructive sleep apnea, the medical record evidence revealed no work related functions limitation based on his non-severe impairments and it appeared that "they have all resolved, are managed with treatment, were diagnosed by a non-acceptable medical source or they do not meet the durational requirements." (*Id.*) The ALJ made no other findings in his determination regarding Mr. Banegas's OMD or related symptoms.

The relevant medical evidence reveals that on May 1, 2013, Mr. Banegas presented to Dr. Javed Iqbal of Neurology Associates of Mesilla Valley, PC, with symptoms of droopy eyes, difficulty swallowing, and weakness in his upper and lower extremities. (Tr. 394-95.) Dr. Iqbal noted that Mr. Banegas had been previously evaluated in his office and diagnosed with OMD. (*Id.*) Mr. Banegas complained that his symptoms were gradually worsening. (Tr. 394.) On physical exam, Dr. Iqbal noted, *inter alia*, that Mr. Banegas had bilateral ptosis (drooping eyelids) and mild proximal weakness in his upper and lower extremities. (Tr. 395.) Dr. Iqbal indicated that OMD was a "progress of muscular dystrophy," and that there was no specific treatment. (*Id.*) He further indicated that Mr. Banegas could undergo surgery for his eyelids,

5

could undergo esophageal dilatation for his swallowing problems, and could try physical therapy for his leg and arm weakness. (*Id.*) Dr. Iqbal instructed Mr. Banegas to return as needed. (*Id.*)

On December 11, 2015, Mr. Banegas testified at the administrative hearing regarding his OMD. (Tr. 66-72.) When questioned about his right shoulder, Mr. Banegas described a greater loss of function with his right arm due to his right shoulder rotator cuff tear, *i.e.,* his ability to lift and reach, but testified that he had a significant amount of loss of strength in both arms due to muscular dystrophy. (Tr. 66-67.) He also testified that while the degenerative arthritis in his right knee causes pain and impacts his ability to walk, he had loss of strength in both legs due to muscular dystrophy. (Tr. 68-69.) He testified that he used a cane for approximately three years to stabilize himself on uneven ground and to have something to hold onto until he could sit down in the event his legs started to give out. (Tr. 69, 71.) Finally, Mr. Banegas testified that his condition had caused his eyelids to fall quite a bit, narrowing his eyes and making it more difficult to see someone standing in front of him and affecting his peripheral vision. (Tr. 70.) Mr. Banegas testified he intended to seek surgery for his drooping eyelids. (*Id.*)

In determining a claimant's RFC, the ALJ should first assess the nature and extent of the claimant's physical and mental limitations. 20 C.F.R. §§ 404.1545(b) and (c). The ALJ is required to consider all of the claimant's impairments, including impairments that are not severe. *See* 20 C.F.R. §§ 404.1545(a)(2); *see also Wilson v. Astrue*, 602 F.3d 1136, 1140 (10th Cir. 2010). "[T]he ALJ must make specific findings," *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996), that are "supported by substantial evidence." *Haddock v. Apfel*, 196 F.3d 1084, 1088 (10th Cir. 1999). Most importantly, the ALJ's "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence. *Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013) (quoting

SSR 96-8p, 1996 WL 374184, at *7). Additionally, an ALJ must give careful consideration to any available information about symptoms because they sometimes suggest a greater severity of impairment than can be shown by objective medical evidence. SSR 95-5p, 1995 WL 670415, at *1.

The ALJ improperly relied on his step two findings as a substitute for an adequate RFC analysis. *Wells*, 727 F.3d at 1071 (citing 20 C.F.R. § 404.1545(a)(2)). The regulations require more. *Id.* An ALJ is required to consider the combined effect of all the claimant's impairments, including those that are non-severe, in assessing his RFC. *Langley*, 373 F.3d at 1124. Here, the ALJ did not discuss Dr. Iqbal's record, did not make any specific findings regarding Mr. Banegas's OMD and related symptoms, and did not include any limitations based on Mr. Banegas's extremity weakness or bilateral ptosis. Further, the ALJ's explanation at step two for excluding Mr. Banegas's OMD related symptoms in his RFC assessment is not supported by substantial evidence. The ALJ stated that the medical evidence of record revealed no work related functional limitations from any of the other non-severe impairments because they had either resolved, were managed with treatment, were diagnosed only by a non-acceptable medical source, or did not meet the durational requirement. (Tr. 16.) Here, Dr. Iqbal, an acceptable medical source, diagnosed Mr. Banegas's OMD, described it as progressive, and indicated there was no specific treatment for it. As such it was not resolved nor was it being managed with treatment. Additionally, this impairment met the durational requirement having been diagnosed sometime prior to May 1, 2013.[4] (Tr. 394-95.) Thus, the ALJ's step two explanation as to Mr. Banegas's OMD is not supported by substantial evidence. Moreover, the step two findings

---

[4] *See* 20 C.F.R. § 404.1505 (a) (explaining that the law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months).

are not an adequate substitute for considering the effects of Mr. Banegas's OMD and related symptoms on his ability to do work-related physical activities.

The Commissioner's arguments that the ALJ did not err in his RFC assessment are unavailing. The Commissioner first argues that the ALJ properly discounted Mr. Banegas's complaints related to his OMD because he had not received any treatment for it or the symptoms he alleged resulted from it. (Doc. 22 at 9-10.) Setting aside that the ALJ noted this at step two in finding this impairment was non-severe, the ALJ nonetheless failed to explain precisely what treatment Mr. Banegas had not received given Dr. Iqbal's note that there was no specific treatment for OMD. (Tr. 395.) Additionally, Dr. Iqbal's indications regarding what Mr. Banegas *could do* to address his OMD related symptoms did not rise to the level of prescribed treatment that Mr. Banegas failed to follow. As such, it would be error for the ALJ to discount Mr. Banegas's subjective reports on that basis. *See Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993) (explaining there are certain factors that must be considered before an ALJ may rely on a claimant's failure to pursue treatment or take medication as support for his determination of noncredibility).

The Commissioner next argues that the record did not support any specific limitations arising from OMD that should have been incorporated in the RFC. (Doc. 22 at 11.) The Administrative Record, however, does not contain a functional assessment prepared by any treating physician or consultative examiner that evaluated Mr. Banegas's specific limitations to do work-related physical activities based on any of his severe and non-severe impairments.[5]

---

[5] The ALJ relied on the RFC assessments of nonexamining State agency medical consultants. (Tr. 20, 21.) On May 14, 2013, Mr. Banegas's treating orthopedic surgeon, Daniel Romanelli, M.D., suggested doing a functional capacity evaluation "to see what he can do and what he cannot do and see if we need to give him permanent restrictions, *which more than likely is probably going to be the case*." (Tr. 356.) (Emphasis added.) On September 7, 2013, Mr. Banegas reported to the Administration that at his last visit with Dr. Romanelli on July 12, 2013, he was given permanent job restrictions to include no excessive walking/standing, no bending or squatting or kneeling, no ladder or pole or stair climbing, no pushing or pulling over 15-20 lbs., and no lifting. (Tr. 246.) The last record

Further, it is undisputed that Mr. Banegas was diagnosed with OMD and experienced related symptoms; *i.e.,* weakness in his upper and lower extremities and bilateral ptosis. (Tr. 394-95.) As such, the ALJ was required in assessing Mr. Banegas's RFC to consider its effect on Mr. Banegas's ability to do work related activities and to give careful consideration to any available information about a claimant's symptoms because they sometimes suggest a greater severity of impairment than can be shown by objective medical evidence. The ALJ failed to do so. *Langley*, 373 F.3d at 1124, SSR 95-5p, 1995 WL 670415, at *1; *see also* 96-8p, 1996 WL 374184, at *5 (explaining that while a non-severe impairment standing alone may not significantly limit an individual's ability to do basic work activity, it may – when considered with limitations or restrictions due to other impairments – be critical to the outcome of a claim).

Finally, the Commissioner argues that the ALJ had already deemed Mr. Banegas's subjective reports regarding his limitations to be less than reliable because of his activities of daily living. (Doc. 22 at 8-9, 11.) An adverse credibility finding does not excuse the ALJ's failure to consider Mr. Banegas's OMD related symptoms in the first instance. *See Thompson v. Sullivan*, 987 F.2d 1482, 1488-91 (describing three-part inquiry for evaluating impairment related subjective complaints and factors to be considered in determining credibility). That aside and being mindful that deference to the fact-finder's assessment of credibility is the general rule, the Court is not persuaded that the ALJ's credibility determination based on Mr. Banegas's daily activities was closely and affirmatively linked to the evidence. *Wilson*, 602 F.3d at 1144 (quoting *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (internal quotation omitted)). Here, the ALJ concluded that Mr. Banegas reported a "high level of completion for activities of daily living which was confirmed by his wife's report." (Tr. 21.) Elsewhere the ALJ stated that

---

from Dr. Romanelli in the Administrative Record is dated May 14, 2013. As such, there is no evidence in the Administrative Record to substantiate Mr. Banegas's representations regarding Dr. Romanelli's assessment.

Mr. Banegas's wife reported that Mr. Banegas's daily routine included feeding livestock and pets, preparing meals, doing light household chores, watering outside plants, doing laundry, driving a vehicle and shopping for necessities. (Tr. 18.) The ALJ further stated that Mr. Banegas confirmed these activities, but also reported that he often had to sit between activities to rest. (*Id.*) The ALJ, however, failed to note the specific facts of Mr. Banegas's reported daily activities. For example, Mr. Banegas reported that he gets dressed, takes 800 mg. of pain reliever, and walks 80 yards to his goat pen where he feeds his goats. (Tr. 236.) He reported that his wife, dad, son or daughter will sometimes help him with doing this chore. (Tr. 228, 237.) When he is finished feeding his goats, he sits on a bench to rest for about 20 minutes. (*Id.*) When he returns home he sits for another 15 minutes before he begins various household chores that may include watering trees and potted plants, sweeping floors in two rooms, or washing a small load of clothes. (Tr. 229, 236, 238.) Each of these chores are done only once or twice each week. (*Id.*) Mr. Banegas reported he sits in a folding chair when he waters the trees. (*Id.*) Mr. Banegas reported his cooking is limited to preparing sandwiches or warming up frozen prepared meals which he does once or twice each week. (Tr. 229, 238.) Mr. Banegas is able to shop for groceries one time per week. (Tr. 230, 239.) Mr. Banegas drives to his parents and/or in-laws home one to three times per week to visit with them. (Tr. 240.) He attends church one time per week. (*Id.*) Thus, when considered in more detail, Mr. Banegas's daily activities are consistent with his claims of physical limitations related to his severe and non-severe impairments. *See Krauser v. Astrue*, 638 F.3d 1324, 1333 (10th Cir. 2011) (finding that the specific facts of claimant's daily activities painted a very different picture than the generalities relied upon by the ALJ to find claimant incredible); *see also Frey v. Bowen*, 816 F.2d 508, 516-17 (10th Cir. 1987) (findings that sporadic performance of daily activities is not inconsistent with

complaints of disabling pain and does not establish that a person is capable of engaging in substantial gainful activity); *Thompson*, 987 F.2d at 1490 (explaining that an ALJ must keep in mind that the sporadic performance of household tasks or work does not establish that a person is capable of engaging in substantial gainful activity).

For the foregoing reasons, the Court finds that the ALJ failed to apply the correct legal standard in determining Mr. Banegas's RFC because he failed to consider the effects of Mr. Banegas's non-severe impairment of OMD and related symptoms on his ability to do work-related activities. This is reversible error. *Wilson*, 602 F.3d at 1140. Additionally, the Court is not persuaded that the ALJ's error is harmless. Here, Mr. Banegas is of advanced age.[6] 20 C.F.R. § 404.1563(e). As such, there must be very little, if any, vocational adjustment required to find a transferability of skills. 20 C.F.R. § 404.1568(d)(4). Here, the VE testified that if Mr. Banegas required more frequent breaks during the work day, or was limited to lifting and carrying of only 10 pounds, that he would not be able to perform his past work. (Tr. 78-79.) As such, the error is not harmless. *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004) (the Court finds harmless error only when it can "confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way").

### B.  **Remaining Issues**

The Court will not address Mr. Banegas's remaining claims of error because they may be affected by the ALJ's treatment of this case on remand. *Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

---

[6] Mr. Banegas was fifty-six years old on his alleged onset date. He was sixty-one years old at the time of the ALJ's determination.

## IV. Conclusion

For the reasons stated above, Mr. Banegas's Motion to Reverse and Remand for Rehearing (Doc. 20) is **GRANTED.**

*Kirtan Khalsa*

**KIRTAN KHALSA**
**United States Magistrate Judge,**
**Presiding by Consent**